## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of | No. 76306-7-I |
| HEIDI K. KAPLAN, | |
| Appellant, | |
| and | DIVISION ONE |
| DONALD C. KAPLAN, | PUBLISHED OPINION |
| Respondent. | FILED: July 23, 2018 |

MANN, A.C.J. — Heidi Kaplan appeals the division of property, award of maintenance, and child support calculation. She argues that the trial court failed to recognize the long-term marriage and to allow her to maintain her predissolution economic status, improperly imputed income to her for child support, and failed to award her attorney fees. We reverse the trial court's decision to impute income for child support. We affirm on all other issues.

### FACTS

Donald Kaplan and Heidi Kaplan married on October 7, 1990.[1] After a marriage of 25 years, Donald and Heidi separated on July 20, 2015. Donald filed a dissolution

---

[1] We refer to the parties by their first names in order to avoid confusion. No disrespect is intended.

action on July 6, 2015, in Harris County, Texas. Heidi filed her petition for dissolution in the King County Superior Court on July 15, 2015. After concluding that Washington had jurisdiction over the dissolution, the Texas court dismissed Donald's petition without an award of costs to either party. A five-day bench trial in King County Superior Court began on June 20, 2016.

At the time of the dissolution, Donald was a business development manager at Phillips 66. Donald had worked for Phillips 66, or its predecessor company, since 1990. Donald's career required the family to move four times for different positions. The family had lived in Seattle since 2001. Donald accepted a promotion in 2014 and transferred to Houston. Heidi and their two children remained in Seattle. At the time of trial, Donald's gross monthly salary was $19,802 monthly and $237,624 annually. Including his average annual bonus, Donald's annual salary was approximately $387,000 per year.

In 2014, Donald and Heidi discussed Donald's desire to retire after their youngest daughter, Sophie, graduated from high school. During trial, Donald testified that he intended to retire in roughly four years. Donald also testified he had concerns about his continued employment at Phillips 66. Brent Longnecker, a consultant who advises energy companies in strategy, governance, and executive pay testified on behalf of Donald. Longnecker testified that Donald's position in business development and acquisitions was at risk because oil companies are less inclined to make capital expenditures and expand their business.

Heidi graduated from Syracuse University in 1985 with a Bachelor of Science degree in speech communications and rhetorical studies. After graduating, Heidi

pursued a career in product development and merchandising until their older daughter, Jillian, was born in 1996. The Kaplan's second daughter, Sophie, was born in 1999. Heidi remained at home to take care of Jillian and Sophie from 1996 until the time of trial in June 2016. At the time of the trial, Jillian was 20 years old and in college in California; Sophie was 17 and a high school senior in Seattle. Over the years, Heidi volunteered at Jillian and Sophie's schools, including acting as president of the parent teacher association. In doing so, she organized fundraisers and events, engaged in community outreach, and managed volunteers. Heidi also attended workshops and courses, such as a grant writing course and an art history course.

At trial, Heidi argued that she was at the time unemployable. David Goodenough, a vocational counselor, testified in support of this contention. Goodenough assessed both Heidi's immediate employability and her long-term career capabilities as of May 2016. Goodenough offered his expert opinion that Heidi was not currently employable except at a "low end" job. Goodenough testified that Heidi required retraining to secure marketable skills, a process that would require time.

The trial court entered findings of fact, conclusions of law, and a final dissolution decree on October 25, 2016. As for the distribution of property, the court found, and the parties do not dispute, that the overall value of the estate was $5.2 million. Donald asked the court to effectively award him 50 percent of the community property. Heidi asked the court to effectively award her 60 percent of the community property. The trial court concluded that "[w]hen the Court considers the nature and extent of all the property, the duration of the marriage and the financial position of each party, it finds

that a fair and equitable division is the allocation of 55% of the assets to Ms. Kaplan and 45% to Mr. Kaplan."

The trial court next addressed maintenance for Heidi. The trial court found that Donald's salary was likely to stay flat or experience only small increases and that future bonuses were unlikely. The trial court also found that Donald hoped to retire in 2020. Heidi requested maintenance in the amount of $18,850 per month for 12 years, until Donald was 66 years old in 2028. Donald agreed that Heidi should receive maintenance, but asked the court to order maintenance for 5 years at $9,500 per month. After finding that Donald would continue working for roughly four more years, that Heidi was healthy, well educated, and had maintained a basic skill set, and that both parties' monthly expenses were approximately $10,000, the trial court awarded maintenance to Heidi at $10,000 per month for 6 years, until August 2022. The court also noted that Heidi may "choose to enroll in an education program," but stated the court "is not specifically awarding maintenance in consideration of any such possible program."

The parties agreed to a parenting plan. The court entered a child support order imputing a monthly income of $2,714 after finding Heidi was "voluntarily underemployed" under RCW 26.19.071(6). The trial court declined to award fees.

Heidi appeals.

## ANALYSIS

### Distribution and Maintenance

1.   Effect of Long-Term Marriage

Heidi's primary argument is that the trial court erred, as a matter of law, in failing to place the parties in roughly the equivalent financial position they had before the dissolution.   We disagree.

Heidi's argument appears based on two incorrect premises.  First, Heidi repeatedly asserts that the trial court "must endeavor to place the parties in roughly the equivalent financial position they had before the dissolution after the dissolution." Heidi offers no legal authority for this assertion.  Upon dissolution, the trial court must provide for a just and equitable distribution of the parties' assets, liabilities, and income. The predissolution economic circumstances of the parties is just one factor that the trial court must consider.  RCW 26.09.080(4) (disposition of property); RCW 26.09.090(1)(c) (maintenance).  Heidi is not "entitled to maintain her former standard of living as a matter of right."  Cleaver v. Cleaver, 10 Wn. App. 14, 20, 516 P.2d 508 (1973).

Heidi also asserts that in distributing assets and awarding maintenance, the trial court must follow the "overarching premise" that because of their long-term marriage, the parties must be placed in roughly equivalent financial positions for the rest of their lives.  Heidi's argument is based on an overly narrow reading of the statement made by this court in Marriage of Rockwell, 141 Wn. App. 235, 243, 170 P.3d 572 (2007), that in long-term marriages of over 25 years "the trial court's objective is to place the parties in roughly equal financial positions for the rest of their lives."

Rockwell, affirmed the trial court's unequal distribution of community property after a long-term marriage. The trial court did not, however, limit its consideration to the length of the marriage or conduct a mathematical analysis to ensure equal financial positions for the rest of the parties' lives. Instead, the trial court examined a variety of factors in reaching its decision to award an unequal distribution. As this court explained,

> This requires considering the combination of the division of property and the expected income and earnings of the parties. And, where one spouse is older, semi-retired and dealing with ill health, and the other spouse is employable, the court does not abuse its discretion in ordering an unequal division of community property. Peter was younger, in good health and employable at a substantial wage. Moreover, substantial evidence showed that Carmen was retired, older and in poor health. Accordingly, the trial court did not abuse its discretion when it compared Peter's age, health and employability (and thereby, future earning capacity) against Carmen's as a basis for its 60/40 split of the community property.

Rockwell, 141 Wn. App. at 249.

In a recent case, Division Three of this court considered and rejected an argument similar to Heidi's. In Marriage of Doneen, 197 Wn. App. 941, 950, 391 P.3d 594, 599 (2017), review denied, 188 Wn.2d 1018, 396 P.3d 337 (2017), the wife appealed the trial court's property division that left her with less than 50 percent of the marital assets. She argued that under Rockwell, the court was required to equalize the financial circumstances of the parties because they had a long-term marriage. Doneen, 197 Wn. App. at 945. The court rejected this argument, holding that the objective established in Rockwell "was permissive in nature, not mandatory, in nature." Doneen, 197 Wn. App. at 950. In affirming, the court noted that the trial court properly "declined to utilize an inflexible rule, but rather properly considered all of the circumstances of the

marriage and exercised its discretion to attain a result in accordance with RCW 26.09.080." Doneen, 197 Wn. App. at 951.

We agree with the analysis in Doneen. An objective of placing the parties to a long-term marriage in "roughly equal" financial positions, is not a mandate for trial courts to predict the future, divide assets with mathematical precision, or guarantee future equality. The trial court must still exercise its discretion to consider all of the statutory factors set out in RCW 26.09.080 and RCW 26.09.090(1)(c) and reach a just and equitable distribution. We decline Heidi's request to hold that failure to place the parties in roughly the equivalent financial position for the rest of their lives constitutes an error of law. The objective stated in Rockwell, is just that, an objective, which is to be considered as the trial court determines the "fair, just, and equitable division of the property."

Accordingly, we review the trial court's distribution of property and award of maintenance.

2.    Distribution of Property

"The trial court's distribution of property in a dissolution action is guided by statute." Rockwell, 141 Wn. App. at 242. The court must consider: "(1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the division of the property is to become effective." RCW 26.09.080. In considering these factors, the court must make a "just and equitable" distribution of the parties' property and liabilities, whether community or separate. RCW 26.09.080. All property is brought before the court for distribution. Farmer v. Farmer, 172 Wn.2d 616,

No. 76306-7-I/8

625, 259 P.3d 256 (2011). The trial court is in the best position to decide issues of fairness. Brewer v. Brewer, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). Accordingly, the court has "broad discretion" to determine what is just and equitable based on the circumstances of each case. Rockwell, 141 Wn. App. at 242.

The trial court is not, however, required to divide community property equally. "The longer the marriage, the more likely a court will make a disproportionate distribution of the community property." Rockwell, 141 Wn. App. at 343. "In a long term marriage of 25 years or more, the trial court's objective is to place the parties in roughly equal financial positions for the rest of their lives." Rockwell, 141 Wn. App. at 242 (citing 2 WASH. STATE BAR ASS'N, WASHINGTON FAMILY LAW DESKBOOK § 32.3(3), at 32-17 (2d ed. 2000)). But "[f]airness is attained by considering all circumstances of the marriage and by exercising discretion, not by utilizing inflexible rules." Marriage of Tower, 55 Wn. App. 697, 700, 780 P.2d 863 (1989). As our Supreme Court explained in Marriage of Konzen,

> This court will not single out a particular factor, such as the character of the property, and require as a matter of law that it be given greater weight than other relevant factors. The statute directs the trial court to weigh all of the factors, within the context of the particular circumstances of the parties, to come to a fair, just and equitable division of property. The character of the property is a relevant factor which must be considered, but is not controlling.

103 Wn.2d 470, 478, 693 P.2d 97 (1985)

"A property division made during the dissolution of a marriage will be reversed on appeal only if there is a manifest abuse of discretion." Marriage of Muhammad, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons."

-8-

Marriage of Larson, 178 Wn. App. 133, 138 313 P.3d 128 (2013). "If the decree results in a patent disparity in the parties' economic circumstances, a manifest abuse of discretion has occurred." Rockwell, 141 Wn. App. at 243.

The net value of the Kaplans' predissolution assets was calculated at $5.2 million, with the overall community property being valued at $4.77 million. The high value community property items included: (1) the parties' house in the Montlake area of Seattle, appraised at $1.3 million, with an existing mortgage of $370,057, for a net value of $944,943; (2) Donald's Vanguard 401(k) savings account, with a net value of $1.8 million; and (3) a commonwealth account with a net value of $1.19 million. The parties also split several lower value accounts. The trial court distributed the full value of the Seattle house to Heidi; making Heidi also responsible for the mortgage. The trial court unevenly divided the Vanguard 401(k) account, with over $1 million being distributed to Heidi, and $768,225 being distributed to Donald. The trial court split the commonwealth financial network account 50/50. In the end, Heidi received a net value of $2,627,298 in community property and Donald received $2,149,434. It is undisputed that Heidi received slightly over 55 percent of the community property.

Heidi acknowledges the trial court distributed the community property on a 55/45 basis in Heidi's favor, but argues the trial court erred by largely giving "Donald liquid assets while giving her nonliquid assets like the marital home." Heidi argues that Donald was left with his income and limited debts, whereas, she received the Seattle house, which is "burdened with a substantial mortgage and major repair needs."

We hold the trial court did not abuse its discretion in its distribution. At trial, Heidi specifically requested that she be awarded the house in Montlake, maintaining she did

not wish to put it up for sale and divide the proceeds. Heidi testified that she intended to live in the house then sell it after Sophie left home. Heidi does not contest the stipulated net value of the house was $944,943, which took into account the mortgage that encumbered the house. Heidi also received a larger share of the 401(k), totaling more than a million dollars. The combined value of the house and the 401(k) account established nearly half of the parties overall assets.

Because the house and the 401(k) each have such a high net value, they necessarily would affect the other assets that Heidi would receive. The trial court had no other way of accommodating these requests without also allocating other assets to Donald "in order to make the division just and equitable." See Wright, 179 Wn. App. at 263. Some of which may have been more liquid. Heidi cannot now complain that she received what she requested.

At trial, and on appeal, Heidi contends the house was less valuable because the house was in need of substantial upgrades to remain livable, and argues the trial court erred in finding the house did not need any immediate repairs. We review a trial court's findings to determine whether they are supported by substantial evidence in the record. Wilson, 165 Wn. App. at 340. This court will not "substitute its judgment for the trial court's, weigh the evidence, or adjudge witness credibility." Rockwell, 141 Wn. App. at 242. "In determining whether substantial evidence exists to support a finding of fact, the record is reviewed in the light most favorable to the party in whose favor the findings were entered." Marriage of Gillespie, 89 Wn. App. 390, 404, 948 P.2d 1338 (1997).

At trial, Heidi testified that the house had cracks in the walls and the driveway required repair. The trial court acknowledged these cracks; however, the trial court

-10-

found the testimony "was consistent that any work to be done is elective and not necessary." The trial court reasoned, "[Heidi] did not present the Court with any documentation from third party contractors about the work she indicated was necessary, and what the cost would be to make repairs or improvements." We hold substantial evidence supports this finding.

At trial, the parties agreed on a joint appraiser, Darcy Simmons. When Simmons was performing her appraisal of the home, Heidi was present and pointed to issues with the house, including the cracks in the plaster and the concrete. Simmons testified that she took those cracks, and the overall condition of the property, into consideration for her appraisal. When the appraisal was finalized, it was not conditioned on the repair of the cracks.[2] Because Heidi did not present evidence to support her claim that upgrades or repairs would be necessary, or that the house was not structurally sound, the trial court did not err in accepting the appraised value.

Heidi also argues that the trial court erred when it "overemphasized the separate property status of some of the parties' assets." In this case, the trial court did preserve the parties' various separate property—and the value of Donald's separate property far exceeded Heidi's separate property.

Donald had several high value items that were identified as separate property: (1) Donald's unvested stock award, valued at $90,176, (2) Donald's unvested restricted stock units accrued after the date of separation with the net value of $150,908, (3) Donald's Bank of America checking account with the net value of $46,122, and (4)

---

[2] At trial, the parties admitted an engineering report, exhibit 7, which apparently stated, "the cracks were cosmetic." However, this exhibit was not provided on appeal. The appraisal was conditioned on the property not having structural damages. No structural damages were shown.

Donald's personal share of the Vanguard 401(k) accruing after the separation with the net value of $50,666. Heidi had two assets identified as separate property: (1) the Michigan condominium Heidi co-owns with her brothers with the net value of $35,417 and (2) her Bank of America checking account with the net value of $16,227. Donald's personal property was worth $373,642 and Heidi's was worth $51,644. Adding the separate property to the community property each party received, Donald received $2,523,076 and Heidi received $2,678,942. With the separate property considered, the distribution percentage shifts slightly, with Heidi receiving 52 percent of the assets.

Heidi is correct that Washington courts no longer abide by a strict rule that protects separate property from distribution. "Under appropriate circumstances," the trial court "need not divide community property equally, it need not award separate property to its owner." White v. White, 105 Wn. App. 545, 549, 20 P.3d 481 (2001). The court need only "make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors." White, 105 Wn. App. at 549; RCW 26.09.080.

However, Heidi has not presented evidence or argument that the trial court abused its discretion in not distributing Donald's personal property. With the separate property considered, Heidi still received 52 percent of the assets, as well as maintenance. The trial court did not abuse its discretion in preserving the parties' personal property.

3. Maintenance

An award of maintenance is "a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." Marriage of Washburn, 101 Wn.2d

-12-

168, 179, 677 P.2d 152 (1984). "The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just." Marriage of Bulicek, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). The factors to be considered include, but are not limited to, "(1) the financial resources of the party seeking maintenance, (2) the time needed to acquire education necessary to obtain employment, (3) the standard of living during the marriage, (4) the duration of the marriage, (5) the age, physical and emotional condition, and financial obligations of the spouse seeking maintenance, and (6) the ability of the spouse from whom maintenance is sought to meet his or her needs and obligations while providing the other spouse with maintenance." Marriage of Valente, 179 Wn. App. 817, 821-22, 320 P.3d 115 (2014); RCW 26.09.090. We review a trial court's award of maintenance for abuse of discretion. Valente, 179 Wn. App. at 822.

The trial court awarded Heidi maintenance of $10,000 per month for 6 years, ending in August 2022. Heidi argues on appeal that this maintenance award was an abuse of discretion because "she is also saddled with heavy expenses to retrain for the work force and to pay child support and post-secondary education expenses for her daughters."

In this case, the trial court entered substantial findings explaining the factors it considered in determining the amount and duration of the maintenance award. The trial court's determination of $10,000 a month was based on evidence presented by Heidi that she needed $10,000 a month to meet her expenses. Heidi did not dispute this finding or provide any evidence that more was required. In determining the length of time for maintenance, the trial court considered that Donald's income was substantially

higher than Heidi's, and the evidence, provided by both parties, that Donald planned to retire in roughly four years. The trial court also stated, "due to substantial assets available to each party, it is clear that [Heidi] has a demonstrated capacity of self-support."

Heidi first assigns error to the trial court's finding that Donald's "position might be at some peril due to changes in the market place, . . . and that he would retire within a few years." Asserting, "[b]oth determinations were entirely speculative." While there is no guarantee when Donald will retire, both parties testified that Donald had stated he wanted to retire in a few years. The trial court found this testimony to be credible, and the appellate court will not substitute its "judgment for the trial court's, weigh the evidence, or adjudge witness credibility." Rockwell, 141 Wn. App. at 242.

Heidi next argues that the trial court failed to properly consider her expert's testimony that she was currently unemployable, and argues the trial court erroneously determined Heidi was healthy, well educated, and had maintained a basic skill set.

Contrary to Heidi's assertion, the trial court did recognize that Heidi was not immediately employable in anything other than a minimum wage position in the ruling. The trial court did, however, discount Heidi's expert testimony, finding

> Mr. Goodenough didn't start work until May 2016. His testimony, in particular the vocabulary he used such as "displaced homemaker" and "trying on the dress" and his indication that he believed that Ms. Kaplan needed to stay home to parent her children, certainly communicated that Mr. Goodenough is operating within an expired and outdated framework. That, and his limited time to evaluate Ms. Kaplan, certainly led this Court to consider his testimony in a very limited manner.

Again, we reserve the determination of witness credibility for the trial court. Rockwell, 141 Wn. App. at 242. Even considering Heidi's employability, the trial court determined,

-14-

"based on the parties' asset base, [Heidi] does not have an imminent need to secure employment." This was not an abuse of discretion.

Heidi argues, however, that the trial court erred in relying on her "asset base" because she should not be required to sell her house or to use the amount given to her in the 401(k). This argument is not supported by law. To the contrary, "[t]he trial court may properly consider the property division when determining maintenance, and may consider maintenance in making an equitable division of the property." Marriage of Estes, 84 Wn. App. 586, 593, 929 P.2d 500 (1997). Heidi was awarded the family home and other assets for her to use to maintain her standard of living. The trial court did not err in considering the assets in awarding maintenance.

Moreover, even if Heidi decided not to use the assets to support her standard of living, there is evidence in the record that six years of maintenance should provide sufficient time to obtain any further education necessary to reenter the job market. Heidi has not demonstrated this maintenance award was unjust or a manifest abuse of discretion.

### Child Support and Imputed Income

Heidi next argues that the trial court erred in its child support calculation by finding she was voluntarily unemployed and imputing income to her because she was a full-time stay at home mother. We agree.

We review child support orders for a manifest abuse of discretion. Marriage of Griffin, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). In calculating child support, the trial court must consider all income and resources of each parent's household. RCW 26.91.071(1). This includes income such as salaries, wages, interest and dividends,

along with other sources of income including maintenance actually received. RCW 26.19.017(3)(q). The trial court is required to impute income to a parent when the parent is "voluntarily unemployed or voluntarily underemployed." RCW 26.19.017(6). The determination of whether a parent is voluntarily unemployed or underemployed is "based upon that parent's work history, education, health, and age, or any other relevant factors." RCW 26.19.017(6). "A court shall not impute income to a parent who is gainfully employed on a full-time basis, unless the court finds that the parent is voluntarily underemployed and finds that the parent is purposely underemployed to reduce the parent's child support obligation." RCW 26.19.017(6).

The trial court found that based on her work history, education, health, and age, Heidi was able to work and was therefore voluntarily unemployed. Based on its finding that she was voluntarily unemployed, the court imputed income of $2,714 per month to Heidi over and above the $10,000 per month in maintenance awarded to Heidi. The trial court erred.

First, the trial court erred in failing to consider that it had already determined that an award of $10,000 per month to Heidi for maintenance was appropriate based on the statutory factors for awarding maintenance. Because RCW 26.19.071(3)(q) requires the court consider maintenance as income during the time that Heidi is receiving maintenance, the court erred in finding Heidi was voluntarily unemployed. Finding Heidi was voluntarily unemployed is contrary to the purpose of awarding maintenance and the child support statute. Moreover, the court failed to consider its own finding that "Ms. Kaplan put her employment advancement on hold in support of the community; specifically, so that she could care for the children as well as support Mr. Kaplan's

career goals that took him out of town extensively." Care for the community and children are "other relevant factors" that the trial court must consider in determining whether Heidi was voluntarily unemployed. RCW 26.19.017(6).

Donald relies on three older cases from Divisions Two and Three of this court in support of his argument that it would have been reversible error had the trial court failed to impute income to Heidi. Marriage of Jonas, 57 Wn. App. 339, 788 P.2d 12 (1990); Marriage of Wright, 78 Wn. App. 230, 896 P.2d 735 (1995); Marriage of Pollard, 99 Wn. App. 48, 991 P.2d 1201 (2000).

Jonas was a modification proceeding involving parents that were both voluntarily unemployed postdissolution. The father was attending school and the mother chose to stay at home to care for their children. Division Two concluded that because both parties elected to remain unemployed for personal reasons, the trial court erred in failing to determine and consider the mother's earning capacity. Jonas, 57 Wn. App. at 340-41.

Similarly, in Wright, Division Two affirmed the trial court's decision declining to award maintenance to the mother after concluding maintenance was not appropriate under the statutory criteria and because an unequal distribution of property substantially improved the mother's financial position. Wright, 78 Wn. App. at 237-38. Then, based on the holding in Jonas, Division Two affirmed the trial court's imputation of $300 per month income to the mother because she was working only half time at a hospital while raising her five children.

In Pollard, Division Three reviewed the trial court's decision failing to impute income in a modification proceeding. Under the terms of the initial dissolution, the

mother was required to pay the father, the primary residential parent, $217 per month for child support. After the mother remarried, she sought modification of the child support because she had left full time employment and was instead staying home to work "full time as a mother and homemaker." Pollard, 99 Wn. App. at 50-51. The trial court agreed to the modification request and reduced the mother's obligation to $85 per month. Pollard, 99 Wn. App. at 51. Division Three reversed after concluding that the mother's choice to give up her previous salary was voluntary and motivated by the decision to stay home and raise the two children from her new marriage.

The facts in this case are distinguishable from Jonas, Wright, and Pollard. Moreover, to the extent Jonas, Wright, and Pollard stand for the proposition that a trial court must impute income anytime a spouse voluntarily stays home in support of the community to raise children, we decline to follow those cases. We hold that where, as here, a spouse in a long-term marriage stays home to care for the children and manage the household while the other spouse works outside the home, the court erred in finding at the time of dissolution that Heidi was voluntarily unemployed and voluntarily underemployed.[3]

Under the facts in this case, the trial court's decision to impute income to Heidi for child support was a manifest abuse of discretion.[4]

---

[3] The record established that Heidi had not been employed since the birth of their first child in 1996.

[4] Heidi argues that the trial court was biased and requests reassignment to a new judge on remand. The remedy of reassignment has limited availability: "even where a trial judge has expressed a strong opinion as to the matter appealed, reassignment is generally not available as an appellate remedy if the appellate court's decision effectively limits the trial court's discretion on remand." State v. McEnroe, 181 Wn.2d 375, 387, 333 P.3d 402 (2014). Only "where review of facts in the record shows the judge's impartiality might reasonably be questioned," will the appellate court remand the matter to another judge. State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d 703 (2017). After reviewing the record in this case, we

*Attorney Fees*

Heidi argues the trial court erred in not awarding her attorney fees due to Donald's intransigence because he filed his original proceeding in Texas. Heidi also argues that this court should award fees under RCW 26.09.140. We affirm the trial court's ruling denying fees and deny fees on appeal.

At trial, the court denied the request for fees, stating "each party should pay his/her own fees or costs." The court noted that "the parties have accessed community funds to pay for their respective attorney's fees" and held,

> [t]here is no evidence of intransigence. To the contrary, the parties have been able to proceed through the course of their dissolution without the need for Temporary Orders of any kind. They entered an Agreed Parenting Plan at the time of trial. There is no evidence to suggest that either party has acted in bad faith or with any intention to unnecessarily increase the cost of litigation to the other, whether financially or emotionally.

At trial, both parties acknowledged that Heidi had used community funds to pay her attorney fees. Heidi later effectively withdrew her request for fees, stating, "I didn't argue fees, because I'm not asking for fees. I had that section in the brief because I felt that if Dr. Smith were forced to testify, it should be unnecessary, I was going to ask compensation for that. But since it ultimately became unnecessary, I didn't pursue the issue of fees."

We review attorney fee awards based on intransigence for an abuse of discretion. Marriage of Bobbitt, 135 Wn. App. 8, 29-30, 144 P.3d 306 (2006). "Discretion is abused when the court's decision is outside the range of acceptable

---

hold the trial court's impartiality cannot "reasonably be questioned," and decline to order reassignment on remand.

No. 76306-7-I/20

choices or based on untenable grounds or untenable reasons." Wixom v. Wixom, 190 Wn. App. 719, 725, 360 P.3d 960 (2015). We hold the trial court did not abuse its discretion. The only claim of intransigence is that Donald originally filed for divorce in Texas. That proceeding was quickly dismissed and no further issues were raised. A finding that Donald was not intransigent was not "outside the range of acceptable choices."

Heidi also requests fees on appeal. This court may award costs and attorney fees on appeal after considering the financial resources of both parties under RCW 26.09.140. Marriage of Wilson, 117 Wn. App. 40, 51, 68 P.3d 1121 (2003). In considering the financial resources of both parties, the appellate court balances the needs of the requesting party against the other party's ability to pay. Marriage of Trichak, 72 Wn. App. 21, 26, 863 P.2d 585 (1993). Both parties argue they should be awarded fees. After considering the record, we deny both parties' request for fees on appeal. Each party is financially able to pay his or her attorney fees and neither would be under a critical hardship to do so.

We reverse the trial court's decision imputing income to Heidi for child support and remand for a recalculation of child support. We affirm on all other issues.

_____
Mann, ACJ

WE CONCUR:

_____          _____

-20-