IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Marriage of: | ) | No. 37743-1-III |
| | ) | |
| CYNTHIA LEAVER, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | OPINION PUBLISHED IN PART |
| and | ) | |
| | ) | |
| BRIAN LEAVER, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, C.J. — Divorce is expensive. When the parties to divorce have disparate earning capacities, post-dissolution maintenance provides a method for softening the economic blow. Maintenance is generally limited in time and tailored to the period necessary for the requesting spouse to get back on their feet. But in rare cases, the requesting spouse has little prospect of reaching financial independence. In such circumstances, long-term or even lifetime maintenance may be warranted.

Brian Leaver's[1] case is one where long-term maintenance *may* be warranted. For over 20 years, Brian was a stay-at-home father with minimal exposure to outside

---

[1] For clarity and readability, we refer to the Leavers by their first names throughout the opinion.

employment. At the parties' dissolution trial, Brian presented uncontested expert testimony that his longstanding mental health conditions, including depression and anxiety, significantly impaired his ability to join the workforce and gain financial independence. Yet the trial court rejected this testimony, instead agreeing with Cynthia Leaver's personal opinion that Brian could do more if he would just put his mind to it. Although the Leavers had a long-term marriage with a high standard of living, and Cynthia had the capacity to pay maintenance, the trial court agreed with Cynthia that Brian's maintenance should be tapered off over the course of just two years. The trial court's adoption of Cynthia's untrained lay opinion over that of the qualified experts was an abuse of discretion, not supported by substantial evidence. We therefore reverse and remand.

## BACKGROUND

*The parties' marriage*

Cynthia and Brian Leaver married in November 1994. Throughout the majority of their marriage, Cynthia was the primary wage earner and Brian was the primary homemaker. The Leavers had four children and shared equally in parenting responsibilities. While both Cynthia and Brian worked outside the home at the beginning of their marriage, Brian began staying home in 1998, just before the birth of their first

child. In 2011, Brian began sporadic part-time work for his brother, earning $20 per hour. Meanwhile, Cynthia became the chief financial officer (CFO) and strategy officer for Numerica Credit Union.

Cynthia's income "steadily increased" and did so "dramatically" during the last 10 years of the marriage. 2 Report of Proceedings (RP) (Jan. 15, 2020) at 619. As Numerica's CFO, Cynthia was one of company's seven "C-level" employees. 1 RP (Jan. 14, 2020) at 410-11. She consistently received an annual raise anywhere between 3 percent and 15 percent of her salary. She also received an annual bonus and recalled only one year, 2009, in which she did not receive any bonus. The size of the bonuses varied, but Cynthia's 2019 net bonus for work performed in 2018 was just shy of $40,000. At the time of the August 2020 final divorce order, Cynthia's monthly net income was $18,118.00. Her 2018 gross annual pay from Numerica was $421,605.00, with net annual pay after taxes and deductions totaling $241,350.05.

The Leavers "bought what [they] needed" to buy and fixed what they needed to fix. 2 RP (Jan. 15, 2020) at 619. They dined outside the home for roughly half of their meals. They purchased tickets to Gonzaga University's basketball games annually, beginning when Gonzaga first opened the McCarthey Athletic Center. At the time the Leavers separated, they lived in a home valued at $485,000.

While the Leavers enjoyed a very comfortable standard of living, they also carried significant debt. The Leavers often carried high credit card balances that were paid off with Cynthia's annual bonuses. The Leavers accrued some debt purchasing dental braces and a personal computer for the children. They had two mortgages on their home and loans on two of their vehicles. When the final divorce order was entered in August 2020, the Leavers had a community debt of over $500,000. The family had almost no liquid assets.

*Pretrial dissolution proceedings*

Cynthia petitioned for divorce on May 25, 2018, after roughly 24 years of marriage. The parties stipulated that they separated on the same date the petition was filed, although Brian did not physically move out of the family home until a later date. The parties came to an agreement on a parenting plan in September, and in October a court commissioner entered a temporary maintenance order pending final dissolution. The initial monthly maintenance award totaled $3,494 with an increase to $3,846 starting in January 2019. Under the terms of the order, Cynthia was required to pay certain monthly expenses for Brian, such as rent, as well as make separate payment directly to Brian.

From reviewing the parties' financial declarations, the commissioner observed Cynthia and Brian had significant discretionary spending, including prepetition

4

expenditures for online shopping, personal care, and meals out. The commissioner noted

in her order that Cynthia and Brian would need to reduce their monthly expenses so as to

accommodate the needs of two separate households. With this in mind, the commissioner

reduced the amounts allocated for various categories of budgeted expenses in determining

the temporary maintenance award.

Despite the commissioner's temporary maintenance order, Cynthia was unable

to reduce her expenses. In fact, her post-separation expenses increased. The increased

expenditures were partly due to the fact Brian was no longer around to cook and perform

household tasks. But in addition, Cynthia cited her professional position, noting a lot was

expected of her in terms of the way she dressed and philanthropic donations. Cynthia

continued to live in the family home, which she described as a "big house" that was

"expensive to maintain." 1 RP (Jan. 13, 2020) at 196.[2] Cynthia testified it was challenging

to limit her children's spending. During the summer of 2019 the children wanted to erect

an above-ground pool in the family's back yard. Cynthia spent approximately $4,700 in

alterations to the yard to make way for the pool. Cynthia also took the children on trips to

places like Banff, Canada; Portland, Oregon; and Missoula, Montana. The main area in

---

[2] During the course of the divorce proceedings, Cynthia estimated her monthly home maintenance costs at $1,543.

which Cynthia was able to reduce expenses was to eliminate voluntary contributions to her retirement account.

While Cynthia stayed in the family home, Brian moved to a nearby apartment with rent of approximately $1,700 per month. Brian spent little money during the separation period because he was uncertain of his finances or what his obligations might be post-dissolution. He calculated his total monthly expenses as at least $4,346. The primary assets retained by Brian during the separation period were some home furnishings, a 2013 Toyota Sienna, and a laptop computer. Brian did not have any separate property. He accumulated $2,200 in debt to his siblings due to medical expenses.

*The dissolution trial*

The parties disputed the financial terms of their dissolution and took their case to trial in January 2020. Brian requested, pursuant to RCW 26.09.090, lifetime maintenance in the amount of $5,500 per month. Brian asserted he suffers from mental and emotional disabilities that preclude his re-entry into the workforce. Cynthia disagreed with Brian's position. She believed Brian capable of working and being financially independent. She requested the court impose a "sink-or-swim type of an order" that would phase out maintenance over the course of two years. 2 RP (Jan. 16, 2020) at 827.

*Brian's position regarding mental health and work capacity*

Brian's trial evidence demonstrated a longstanding history of mental and physical health struggles. Brian was 49 years old at the time of trial. He attempted suicide at age 18.[3] He carries several mental health diagnoses, including major depression and anxiety. Brian presented testimony from his longtime psychiatrist[4] and a neuropsychological evaluator. The professional testimony indicated Brian's mental health conditions are "severe" and "treatment resistant." 1 RP (Jan. 13, 2020) at 231, 291; 2 RP (Jan. 15, 2020) at 710. Brian has occasional suicidal ideation, is at an elevated risk for suicide, and was hospitalized three times during the course of the divorce proceedings.

Brian's depression is "cyclical." Ex. R-117 at 1; *see also* 2 RP (Jan. 15, 2020) at 710-11. At times, Brian has shown signs of improvement. However, he then goes through "cycles of shutting down and not doing well with longer episodes of depression and anxiety." Ex. R-117 at 1. Brian's depression does not necessarily prevent him from "running small errands" or "getting his children to and from school," but it does make it more difficult for him to "leave the house." 2 RP (Jan. 15, 2020) at 713. Exercise is

---

[3] Brian's father died from suicide and his mother has had chronic mental health problems.

[4] Brian has been seeing the same psychiatrist since September 2002.

therapeutic for Brian's condition.

Unlike his depression, Brian's anxiety is "constant." *Id*. at 714. Brian regularly struggles with fear of leaving the house or interacting with others. At times it is difficult for him to get out of bed and he will need hours or days to collect himself.

According to his psychiatrist and the neuropsychological evaluator, Brian's mental health conditions negatively impact his ability to work. Both professionals consider Brian "disabled." 1 RP (Jan. 13, 2020) at 248; 2 RP (Jan. 15, 2020) at 711. Brian's psychiatrist testified he was "skeptical" Brian would ever be able to find an appropriate work setting. 2 RP (Jan. 15, 2020) at 721. According to the psychiatrist, Brian's anxiety would be escalated by a return to the workforce and he would "probably need a lot of support, encouragement, probably repeated tries." *Id*. at 727.

While severe, Brian's mental health conditions do not render him fully incapacitated. He is intelligent, well educated, and helped raise four children. Brian participates in a bowling league and, at times, he has participated in group athletic activities and volunteer work. During the course of his marriage, Brian performed household tasks, including preparing a prior family home for resale. Since 2011, Brian has had some part-time, seasonal employment with his brother's business, earning $20 per hour, a few hours a year.

Brian testified he wants to work and thinks he might be able to build up to working 10 to 20 hours per week. Brian believes he is not eligible for Social Security Disability Insurance through the Social Security Administration, because he does not have sufficient work history to draw from. The last time Brian earned more than a four-figure annual income was 1997, when he earned $23,627.75. Ex. R-150 at 9. Brian was deemed most likely ineligible for Supplemental Security Income (SSI) benefits because he was not sufficiently impoverished. Ex. R-148.[5]

*Cynthia's position regarding mental health and work capacity*

Cynthia disagrees that Brian is disabled. Cynthia testified Brian's mental health struggles impact "his ability to believe that he can work" rather than his actual ability to work. 1 RP (Jan. 14, 2020) at 475. According to Cynthia, Brian is capable of doing more than he gives himself credit for. This is reflected in child-rearing skills and house work. According to Cynthia, Brian should be able to work his way up to full-time employment at $20 per hour. Cynthia points to a vocational assessment ordered by the trial court which posits Brian would be capable of gaining employment as a "Bank Teller, Customer

---

[5] Brian received an informal opinion on SSI benefits during the pendency of the divorce proceedings. At that point, Brian was receiving approximately $1,900 in monthly support payments from Cynthia. The Social Security Administration deemed this income too high to qualify for SSI benefits.

Service Representative, Shipping/Receiving Clerk and Groundskeeper" Ex. R-148 at 4.

The assessment was based on Brian's education and work history; it specifically did not

take into account Brian's mental health issues.

Although she has not been "deeply," 1 RP (Jan. 14, 2020) at 468, involved in

Brian's mental health treatment, Cynthia testified Brian's anxiety is a "bigger issue" than

his depression. *Id*. at 470. Cynthia knows Brian attempted suicide at age 18. However, she

is not sure it was "serious." *Id*. at 464. Cynthia felt the suicide attempt, which consisted of

an aspirin overdose, may have been more of a "cry for help" than a true attempt at self-

harm. *Id*. at 464-65. Cynthia has a hard time distinguishing Brian's mental health

problems from his simply "not being a very nice person." *Id*. at 471.

Cynthia believes the financial support she has provided over the years has hindered

Brian's ability to work. She characterizes the financial support as a "crutch," leading

Brian to believe he does not have to work. *Id*. at 189. Cynthia acknowledged at trial that

she has the ability to pay maintenance. *Id*. at 497. Her position was Brian "does not need

maintenance or could get to a position where he could not need maintenance." *Id*. Cynthia

did not present any professional witnesses at trial to support her claims regarding the

impact of Brian's mental health on his capacity to work.[6]

*Trial court's rulings*

The trial court determined the parties had been involved in a long-term marriage and ruled it would divide the parties' assets equally. The final distribution to Brian included one half of the parties' 2018 federal income tax refund ($6,471), the 2013 Toyota Sienna (valued at $16,425), one half of a retirement account ($245,473), and an equalization payment of $11,841.

When addressing the issue of maintenance, the court found Brian was not feigning or exaggerating his mental health condition. Nevertheless, the court determined Brian's symptoms were not "debilitating." 2 RP (Feb. 26, 2020) at 890. According to the trial court, there was "a lot more [Brian] could do if he put his mind to it." *Id*.

---

[6] As previously noted, Cynthia did rely on a court-ordered vocational assessment, but the assessment did not take into account Brian's mental health issues. Cynthia also presented testimony from a psychologist who testified that the level of incapacity discussed in the neuropsychological evaluation report may have been inflated. The psychologist suggested Brian may have had an incentive to exaggerate his symptoms for secondary gain. The psychologist never interviewed Brian and did not otherwise conduct an independent evaluation. The psychologist's trial testimony was limited to rebuttal of Brian's neuropsychological evaluator. In its oral ruling following trial, the court did not "put very much credence in [the psychologist's] comments about secondary gain." 2 RP (Feb. 26, 2020) at 890. The court did not find Brian was "feigning or exaggerating his symptoms." *Id.*

The trial court permitted Brian to retain the temporary maintenance already awarded by the commissioner, but it reduced future maintenance to $3,500 per month for one year beginning March 1, 2020, with a further reduction to $2,000 per month for the following year. The court "reserve[d] the issue of future maintenance." *Id*. at 891; *see also* CP at 179-80. The court emphasized its intent was "not to have lifetime maintenance," explaining lifetime maintenance was "disfavored in the law." 2 RP (Feb. 26, 2020) at 891. The court further ruled Cynthia would be responsible for her own attorney fees and one half of Brian's outstanding attorney fees.

ANALYSIS

*Spousal maintenance*

Brian challenges the trial court's maintenance decision. We review the trial court's factual findings for substantial evidence. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). If the findings are adequately supported, the ultimate issue of how to apply the governing law is reviewed for manifest abuse of discretion. *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985). This is a very deferential standard. We will not substitute our judgment for that of the trial judge. *Rockwell*, 141 Wn. App. at 242. Nevertheless, the right of appeal is not toothless.

12

We will reverse the trial court's discretionary ruling if it falls outside the bounds of a reasonable adjudication. *See Landry*, 103 Wn.2d at 809-10.

A trial court's decision on maintenance is governed by RCW 26.09.090. Courts are authorized to award maintenance "in such amounts and for such periods of time as the court deems just." RCW 26.09.090(1). Maintenance should not be awarded as a matter of right. *In re Marriage of Luckey*, 73 Wn. App. 201, 209, 868 P.2d 189 (1994). A trial court assessing a maintenance request must consider several nonexclusive statutory factors, including: the parties' financial resources; the time necessary for the requesting party to acquire job-related education or skills; the standard of living during marriage; the duration of the marriage; the age, physical, financial, and emotional condition of the requesting party; and the ability of the spouse from whom maintenance is sought to pay. RCW 26.09.090(1)(a)-(f).

Here, it is uncontested that the majority of the statutory factors favor an award of long-term maintenance. Brian has very little in the way of liquid assets. Additional training or education would not appear to address Brian's barriers to self-sufficiency. The parties had a long-term marriage with a high standard of living. And Cynthia acknowledged at trial that she has the means to pay maintenance.

13

The contested issue pertains to whether Brian has a mental health condition warranting an award of long-term maintenance. RCW 26.09.090(e). The trial court found Brian was not feigning or exaggerating his mental health conditions. Nevertheless, the court concluded the conditions were not disabling. The court adopted Cynthia's position that Brian could work if he put his mind to it. Consistent with Cynthia's request, the trial court adopted a step-down approach to maintenance, whereby Brian's maintenance support would decrease over the course of two years. Although the trial court did not definitively order maintenance would cease after two years, the court emphasized its intent was not to award lifetime maintenance. This comment suggests the plan was to taper off Brian's maintenance at the end of two years.

As explained below, the trial court's finding that Brian was not disabled and the adoption of Cynthia's assessment regarding Brian's potential for re-entry into the workforce is not supported by substantial evidence. *See In re Marriage of Hall*, 103 Wn.2d 236, 246, 692 P.2d 175 (1984) ("Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise.").

The only expert witness opinion testimony submitted at trial was that Brian is disabled. Both Brian's psychiatrist and the neuropsychological evaluator took the firm position that Brian is disabled and that his prospects for re-entry into the workforce were

guarded if not grim. The trial court did not reject the testimony of Brian's experts as unfounded or contrary to the weight of the evidence. On the record before the court, the expert opinion that Brian's mental health condition rendered him disabled was valid and uncontested.

Cynthia testified in opposition to the experts and expressed her lay opinion that Brian is not so disabled that he could not work. Cynthia was certainly competent to explain her observations of Brian and her day-to-day interactions with him. But Cynthia has never witnessed Brian work outside the home on a full-time or near full-time basis at his current stage of mental illness. Cynthia is not a witness with scientific, technical, or specialized knowledge about mental illness. By her own admission, she was not even deeply involved in Brian's mental health treatment. Mental illness, particularly depression, can present itself with symptomatology resembling personality defects such as laziness or lack of motivation. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-5, at 168-69 (5th ed. 2013). Given the risk of confusion, there is a grave danger in deferring to a layperson's assessment of the nature of mental illness, particularly when the layperson has a financial incentive to disregard the impact of mental illness. Cynthia was not qualified under ER 702 to testify about the impact of Brian's mental health disorders on his capacity to work.

It was therefore manifestly unreasonable for the trial court to adopt Cynthia's assessment of Brian's mental health over that of the qualified experts.

The chronic nature of Brian's disability and his seemingly endless need for financial support makes this case very difficult. Maintenance "is not a matter of right." *Hogberg v. Hogberg*, 64 Wn.2d 617, 619, 393 P.2d 291 (1964). Generally, the question regarding maintenance is how much time a requesting spouse will need to find appropriate employment. RCW 26.09.090(1)(b). When the requesting spouse "has the ability to earn a living," long-term maintenance is unwarranted. *Hogberg*, 64 Wn.2d at 619. The parties to a divorce deserve finality and to go forward with their separate lives. "[I]t is not the policy of the law of this state to give [the spouse requesting maintenance] a perpetual lien on [their] divorced [spouse's] future income." *Id*.

But the fact that a requesting party's need for maintenance appears endless is not a reason to deny long-term maintenance. Long-term or lifetime maintenance is a legal possibility. *See* 1 WASH. STATE BAR ASS'N, WASHINGTON FAMILY LAW DESKBOOK § 27.7, at 27-15 (2d ed. 2000) ("[A]fter a long-term marriage or in a situation in which there is little or no possibility of [the requesting spouse] ever being self-supporting, much less being able to continue at the standard [of living] enjoyed during the marriage, there may be a strong argument that maintenance should never cease."). While lifetime

maintenance is disfavored, it would be an abuse of discretion for the trial court to reject it categorically. *See State v. O'Dell*, 183 Wn.2d 680, 697, 358 P.3d 359 (2015) ("[F]ailure to exercise discretion is itself an abuse of discretion subject to reversal."). Although rare, courts must keep in mind that long-term or lifetime maintenance will sometimes be warranted. This may be especially true where one spouse has an ability to pay, but the marital community has not retained sufficient liquid assets to assure a requesting spouse the ability to be self-sufficient.

We reverse the trial court's maintenance ruling and remand for reassessment in light of the applicable statutory factors. Our disposition should not be read to mean Brian is entitled to lifetime maintenance, or even that he should receive a lifetime or long-term award. Contrary to Brian's assertions on appeal, the trial court is not required to place Cynthia and Brian in roughly equal positions for the rest of their lives. *See In re Marriage of Kaplan*, 4 Wn. App. 2d 466, 474-76, 421 P.3d 1046 (2018). The objective of placing the parties on equal footing is permissible, but "'not mandatory.'" *Id*. at 475 (quoting *In re Marriage of Doneen*, 197 Wn. App. 941, 950, 391 P.3d 594 (2017)). By his own testimony, Brian is capable of working, albeit not at a level allowing him to come close to meeting his prior standard of living. It is reasonable for the trial court's maintenance decision to contemplate Brian will enter the workforce.

17

To the extent the trial court and Cynthia are concerned that Brian's circumstances will improve for the better or that Cynthia's will fare for the worse, the law provides the option of modification. RCW 26.09.170. Maintenance should not be awarded in a way that is so open-ended it deprives the litigants of finality. *See In re Marriage of Valente*, 179 Wn. App. 817, 827, 320 P.3d 115 (2014). Instead the court should issue an award based on the evidence produced at trial, keeping in mind the law provides a remedy for changed circumstances.

We reverse the trial court's maintenance determination and remand for further proceedings.

The panel has determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports. Therefore, it is ordered that the remainder of this opinion, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040.

*Property distribution*

Brian argues the trial court's division of property failed to meet the court's stated goal of equally dividing the parties' assets. We largely disagree with this assessment. We address each disputed area individually.

*Split dollar asset*

One of Cynthia's retirement benefits from Numerica is a "split dollar" life insurance policy. *See* Exs. P-44 - P-48. The policy has a face value of almost $7,000,000. The policy requires Cynthia to pay $220,000 in premiums annually over a 10-year period, from 2012 until 2022. In reality, Numerica loans Cynthia the funds to pay the premiums, interest free, and compensates her for the resulting taxes. If Cynthia remains with Numerica until 2035, she will gain the full value of the policy and be able to draw on dividends borrowed against the policy. Upon Cynthia's death, the policy will reimburse Numerica for the initial cost of the policy, pay off dividends borrowed against the policy, and provide the balance of the $7,000,000 policy to Cynthia's beneficiaries.[7]

The parties disputed whether Cynthia would be able to draw a benefit from the policy prior to 2035. Brian presented testimony that Cynthia would be able to start borrowing against the policy as early as 2022, when Cynthia makes the last premium payment on the policy. This could yield at least $55,000 per year, tax free. Cynthia denied she would have any ability to draw on the policy before it vested in 2035. If Cynthia were

---

[7] Hence the "*split dollar*" benefit, as Numerica and Cynthia will "split" the proceeds of the policy.

to voluntarily leave Numerica prior to 2035, she claimed she would not receive any value from the policy.

In addition to disputing when Cynthia could start drawing on the policy, the parties disagreed as to whether it had any present value. Cynthia testified the split dollar policy had no present value because it was not vested and might never result in a payout. Brian presented expert testimony that this asset had a current value of approximately $800,000.

The trial court found the evidence inconclusive as to whether Cynthia would be able to begin drawing on the policy prior to 2035. With respect to value, the court agreed with Brian that the policy had some present value. However, the court declined to apportion the policy by determining the value and then requiring a buyout.

The court ruled Brian should receive 50 percent of the community's portion of the split dollar asset, payable at any time Cynthia or her estate draws from the policy. The court reasoned the community had contributed to 7 of the 20 years necessary to fully vest in the policy. This resulted in 35 percent of the account being community property, with one half (17.5%) awarded to Brian. The court's final order stated Brian would be entitled to 17.5 percent of any future payout from the policy, regardless of whether it is characterized as a death benefit, severance, retirement benefit, loan, or pension.

On appeal, Brian argues the trial court's award fails to leave him with one half of the community's portion of the policy. If Cynthia were to draw on the policy prior to 2035, the community's portion of the investment would be larger than 35 percent. Brian argues that as Cynthia continues to work at Numerica, her separate portion of the asset increases and the community's portion decreases. Thus, rather than use a flat percentage, Brian argues the trial court should have used a formula that takes into account the date of disbursement in determining Brian's portion of the split dollar asset.

The problem with Brian's position is that the trial court did not find Cynthia would be able to draw on the split dollar asset prior to 2035. The evidence on this point was unclear. Rather than simply conclude there was no value to the account prior to 2035, the trial court determined Brian would receive a 17.5 percent payment regardless of how or when payments were made from the account. This determination was within the trial court's broad authority for fairly apportioning property and was actually higher than the 12.5 percent amount requested by Brian in closing argument.

*Numerica checking and savings account*

Brian argues it was an abuse of discretion for the trial court to calculate the value of the Numerica joint checking and savings account from the statement at the end of June 2018, not the end of May 2018, as the parties stipulated that separation occurred on

May 25, 2018. We find no abuse of discretion. There was competing testimony the balance of the joint account was approximately $5,600 or $3,100. The court split the difference at $4,850. This was a fair and equitable valuation.

### *Income tax refund*

Brian argues the trial court abused its discretion by attributing half of the value of the refund from the parties' jointly filed 2018 federal tax return to him when it was actually retained in its entirety by Cynthia. This argument appears to have merit.

The trial testimony indicated Cynthia had retained the 2018 tax refund in its entirety. In the court's findings of fact and final divorce order, it was likewise awarded to Cynthia in its entirety. However, in the court's calculations for the equalization payment, it credited Brian with having received one half of the value of the tax refund. No evidence supported this finding. If the court had credited Cynthia with the entire tax refund, Brian may have received a larger equalization payment. On remand the court should reassess this issue.

### *Marital home*

Brian argues the trial court abused its discretion by not taking into account the marital home's increase in value between separation and trial. Brian's arguments rely on facts outside the record. We therefore decline review of this issue.

*Hyundai vehicle*

Brian contends it was an abuse of discretion for the trial court to award Cynthia

the Hyundai used by their daughter, but to not assign it a value awarded to her in its

calculation of the equalization payment. We find no abuse of discretion. Neither Brian

nor Cynthia presented any evidence as to the Hyundai's value. Instead, they agreed their

daughter would be provided the Hyundai. Under these circumstances it was not unfair or

inequitable, and thus not an abuse of discretion, for the trial court to decline to assign a

value to the Hyundai, even though it was technically awarded to Cynthia in the property

distribution.[8]

*Credit card debt*

Brian claims Cynthia artificially increased her debt load by using credit cards, and

the trial court abused its discretion by characterizing her credit card debt as installment

debt akin to a car loan or a mortgage, and not as recurring monthly expenses. However, it

is not an abuse of discretion for a court to characterize credit card debt as community debt

and assign it to a spouse in a property distribution. *See In re Marriage of Manry*, 60 Wn.

---

[8] In general, it is an abuse of discretion for a trial court to award third parties, including the parties' children, marital property. *Sutherland v. Sutherland*, 77 Wn.2d 6, 9, 459 P.2d 397 (1969).

App. 146, 150-51, 803 P.2d 8 (1991). Thus, the trial court did not err by doing so here.

*Attorney fees*

Brian contends the trial court abused its discretion by awarding him less than 100 percent of his attorney fees given his need and Cynthia's ability to pay. Cynthia answers that the trial court's attorney fee decision was reasonable, taking into consideration Cynthia's financial obligations and Brian's receipt of the equalization payment under the final divorce order, and given Brian already received fee awards throughout the dissolution proceedings. Brian replies the award was nevertheless an abuse of discretion because the equalization payment under the final divorce order was his only liquid asset, and his share of the fees exceeded that payment.

An award of attorney fees in a dissolution case is reviewed for abuse of discretion. *In re Marriage of Obaidi*, 154 Wn. App. 609, 617, 226 P.3d 787 (2010). "The party challenging the award bears the burden of proving that the trial court exercised this discretion in a way that was clearly untenable or manifestly unreasonable." *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994).

RCW 26.09.140 states that "after considering the financial resources of both parties [a court] may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable

24

attorneys' fees." In ruling on a request for attorney fees under RCW 26.09.140, "the court must balance the needs of the one party against the other party's ability to pay." *In re Marriage of Coons*, 53 Wn. App. 721, 722, 770 P.2d 653 (1989).

Here, the trial court correctly identified that Cynthia, a highly compensated credit union executive, had the ability to pay Brian's attorney fees. It further found Brian had the need for assistance. As a result, the court ordered Cynthia to pay one half of Brian's outstanding attorney fees. Nevertheless, Brian argues it was an abuse of discretion for the court not to order her to pay the entirety of his attorney fees. In support of his argument, Brian cites no authority that requires a trial court to order one spouse to pay the entirety of the other's fees in like circumstances. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). The fact that we may have exercised our discretion differently does not mean the trial court abused its discretion. The trial court's attorney fee award is therefore affirmed.

APPELLATE ATTORNEY FEES

Brian requests an award of attorney fees on appeal under RAP 18.1 and

RCW 26.09.140 based on the disparity between his financial circumstances and

Cynthia's. Cynthia responds that this court should not award Brian further fees.

Under RAP 18.1, a party is entitled to request an award of reasonable attorney

fees or expenses on appeal if applicable law grants the party a right to recovery.

RCW 26.09.140 states that "[u]pon any appeal, the appellate court may, in its discretion,

order a party to pay for the cost to the other party of maintaining the appeal and attorneys'

fees in addition to statutory costs." As with a request for fees before a trial court, on

appeal this court must balance one party's financial need with the other's ability to pay.

*Coons*, 53 Wn. App. at 722. In ruling on a request for fees on appeal, this court may also

consider evidence from trial. *See In re Marriage of Jacobson*, 90 Wn. App. 738, 746,

954 P.2d 297 (1998).

Brian submitted a timely financial declaration, pursuant to RAP 18.1(c), indicating

his monthly net income is $3,062; resulting from $1,301 in wages and $2,000 in

maintenance. Brian reports $19,700 in liquid assets. Over two months after the deadline

to do so expired, Cynthia filed her own financial declaration, indicating she is now

unemployed and has exhausted unemployment benefits. Cynthia declares that her net

monthly income is $1,591 in the negative with $28,642 in liquid assets. We accept for filing Cynthia's overdue declaration and consider each party's declaration for the sole purpose of determining attorney fees on appeal. *See* RAP 18.1(c). Based on the financial declarations of the parties, Brian's request for attorney fees on appeal is denied.

## CONCLUSION

The trial court's maintenance determination is reversed. This matter is remanded for reconsideration of maintenance and for allocation of the parties' 2018 federal income tax refund. The trial court's final divorce order is otherwise affirmed. We decline to award attorney fees on appeal.

_____, C.J.
Pennell, C.J.

WE CONCUR:

_____, J.
Fearing, J.

_____, J.
Staab, J.

27