**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In the Matter of the Marriage of | No. 57644-9-II |
| CHRISTOPHER DEAN MILLES, | |
| Appellant, | |
| and | UNPUBLISHED OPINION |
| DENISE MAXINE MILLES, | |
| Respondent. | |

MAXA, J. – Christopher Milles appeals the trial court's characterization of his house as community property. He purchased the house in 1996 and married Denise Milles in 2011. In 2020, Christopher[1] refinanced the house to obtain a lower interest rate and to take cash out. As part of that process, he quitclaimed the house to himself and Denise and the deed stated that it was to establish community property.

We conclude that (1) the trial court properly applied the correct legal analysis in assessing the character of the house and (2) substantial evidence supports the trial court's finding that Christopher intended to convert the house from separate property to community property. Accordingly, we affirm the trial court's characterization of the house as community property.

---

[1] To avoid confusion, the Milles will be referred to individually by their first names. No disrespect is intended.

FACTS

*Background*

Christopher and Denise Milles were married from 2011 to 2021. This was the second marriage for both Christopher and Denise, and both came into the marriage with children and separate assets. Denise also entered the marriage with some separate debt.

Throughout their marriage, the family lived together at a house located in Tacoma (the house). Christopher had purchased the house in 1996 when he was single.

*Christopher's First Marriage*

Christopher married his first wife, Cara, in 2000. In 2005, Christopher refinanced the house to take cash out of the house's equity. In doing so, Christopher signed a quitclaim deed giving title of the house to himself and to Cara. The deed stated, "Christopher D. Milles, a Married Man conveys, and quit claims to Christopher D. Milles and Cara S. Milles, Husband and Wife, the following described real estate." Ex. 139, at 1. Christopher testified that when signing the quitclaim deed, he intended to convert the house to community property.

Christopher and Cara divorced in 2010. During Christopher's and Cara's divorce settlement, Christopher agreed that the house was community property. As part of the divorce settlement, Christopher refinanced the house to remove Cara's name from the title and to take money out to pay Cara her share of the community property.

*The Milles' Finances*

The Milles had six bank accounts. Three of them were joint accounts. They also had a joint tenancy investment account.

Christopher testified that he paid the family's debts using money from his paycheck, Denise's paycheck, and the child support payments that Denise received from her first husband.

He also stated that he and Denise consolidated and comingled their financial accounts from early on in their marriage because it was the best way to pay off their debts.

Although Denise was included in all the financial decisions and made debit and credit card transactions, Christopher testified that he was the one to pay the bills by writing checks and making money transfers. Christopher primarily made the payments to the family's creditors and he kept track of the debt and finances. Christopher paid the bills, including the mortgage on the house, from a joint TwinStar account. In addition, Christopher testified that Denise did not help him budget and she did not pay attention to the finances.

Denise testified that right after they were married, Christopher wanted to combine their finances. They discussed how they were going to spend their money and fix up the house together. Denise put Christopher's name on every account she had. She added Christopher to her rollover IRA account. She initially funded the account with money she earned before marrying Christopher, but once married, Christopher transferred money from their joint TwinStar account into the IRA account.

Christopher had access to all of Denise's accounts and he managed paying the bills. Although they would discuss how they were spending their money, Denise never felt the need to look at their bank records or transaction history because Christopher managed the finances.

*2020 Refinance and Quitclaim Deed*

Christopher testified that he refinanced the house in 2020 for $195,000 and received $25,000 cash back. The money he received from the refinance went toward paying credit card debt incurred during marriage.

The bank prepared the deed of trust and either the bank or title company prepared the quitclaim deed. The deed stated, "Christopher D. Milles, a married man for and in consideration

3

of *To establish community property* conveys and quit claims to Christopher D Milles and Denise M Milles, husband and wife the following described real estate." Ex. 105, at 1 (emphasis added).

Christopher testified that it was not his intention to create community property with Denise. Instead, he wanted to take advantage of the low interest rate. He stated that Denise's name was put on the deed without him knowing because he just signed all the documents that were given to him. He was only interested in the interest rate and did not read or pay attention to the rest of the document.

*Bench Trial*

The trial court conducted a bench trial in which only Christopher and Denise testified. Following the trial, the court entered findings of fact and conclusions of law. The findings included the following in finding of fact 22:

> j. The home [in] Tacoma, WA started as a separate asset of [Christopher], but the court assessed the credibility of the witnesses, and the court finds by clear, cogent and convincing evidence that *[Christopher's] intent was to convert his separate property into community property when he signed the Quit Claim deed with the verbiage "intent to create community property"*.
>
> k. The court considered the following when assessing [Christopher's] intent:
>
> 1. The parties were married for quite some time when the Quit Claim Deed was signed.
>
> 2. The parties had comingled funds, an[d] [Denise's] financial resources helped to contribute to the mortgage payments.
>
> 3. [Christopher] had prior experience in his first marriage, in terms of converting separate interest to community interest by Quit Claim Deed, and the Court finds [Christopher's] testimony not very credible that he did not understand what he was signing when he signed the Quit Claim Deed to the marital community with [Denise].

4. [Christopher's] prior actions, and his meticulous handling of financial affairs make it clear to the Court that he intended to create community property when he signed the 2020 Quit Claim Deed.

Clerk's Papers (CP) at 203 (emphasis added).

The trial court ruled that the house was community property. The court awarded the house to Christopher, but ordered Christopher to make an equalization payment of $128,709 to Denise.

Christopher appeals the trial court's characterization of the house as community property.

ANALYSIS

A.    STANDARD OF REVIEW

A trial court's characterization of property as separate or community is a mixed question of fact and law. *In re Marriage of Watanabe*, 199 Wn.2d 342, 348, 506 P.3d 630 (2022). We review for substantial evidence the trial court's factual findings regarding the characterization, such as time of acquisition, method of acquisition, and intent of the donor. *Id.* Substantial evidence is the amount of evidence sufficient to convince a rational, fair-minded person that a premise is true. *Real Carriage Door Co., ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955 (2021). All evidence and reasonable inferences are viewed in the light most favorable to the prevailing party. *Id.* Findings of fact that are unchallenged are treated as verities on appeal. *Id.*

As discussed below, the standard for proving intent to convert separate property to community property is clear and convincing evidence. *In re Estate of Borghi*, 167 Wn.2d 480, 484-85 & n.4, 219 P.3d 932 (2009). Clear and convincing evidence exists when the ultimate facts are shown to be highly probable. *In re Marriage of Bresnahan*, 21 Wn. App. 2d 385, 406, 505 P.3d 1218 (2022).

The characterization of property as separate or community is a question of law that we review de novo. *Watanabe*, 199 Wn.2d at 348-49.

B.       CHARACTERIZATION OF PROPERTY

Christopher argues that the trial court erred in finding that he intended to convert his house from separate property to community property. We disagree.

1.    Legal Principles

A property's character is determined at the date of acquisition. *Borghi*, 167 Wn.2d at 484. Once property is established as separate, "a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property." *Id.* The character of separate property can be changed to community property only if clear and convincing evidence shows that the spouse intended to make such a change. *Id.* at 484-85 & n.4.

Intent to change the character of property from separate to community can be shown through a quitclaim deed to the community. *Id.* at 485. However, merely putting a "name on a deed or title does not determine the separate or community character of the property, or even provide much evidence." *Id.* at 488. Specifically, no presumption that community property has been established arises when title to property is changed from one spouse to both spouses. *Id.*

> Allowing a presumption to arise from a change in the form of title inappropriately shifts attention away from the relevant question of whether a gift of separate property to the community is intended and asks instead the irrelevant question of whether there was an intent to make a conveyance into joint title.

*Id.* at 489.

When a quitclaim deed states that the purpose of putting both spouses on the title is to establish community property, the trial court can consider extrinsic evidence to determine the grantor's intent. *Watanabe*, 199 Wn.2d at 355.

In *Borghi*, the wife purchased real property before marriage. After the marriage, the wife executed a special warranty deed to her and her husband, as "husband and wife." 167 Wn.2d at 482. The couple lived on the property and later used it to secure a mortgage to purchase a mobile home to put on the property. *Id.* After the wife died, there was a dispute over whether the property was her separate property or community property. *Id.* at 482-83.

The Supreme Court held that no presumption arose from the names on the deed or title and that no acknowledged writing evidencing the wife's intent to transfer her property to the community existed. *Id.* at 490-91. Therefore, in the absence of clear and convincing evidence, the property remained separate. *Id.* at 491.

In *Watanabe*, during marriage, the wife's mother died and left half of her estate to the wife. 199 Wn.2d at 345. The couple moved to a property in Arlington that the wife's mother had owned. *Id.* Later, in order to finance the purchase of property in Ford, the couple obtained a loan that was secured by the Arlington property. *Id.* at 346. But to get the loan, the bank required that the wife add the husband to the title of the Arlington property because the wife had no credit history. *Id.*

The wife quitclaimed her interest in the Arlington property to herself and her husband "to establish community property." *Id.* The wife did not recall signing the quitclaim deed and claimed that she did so only because the loan required it. *Id.* She testified that she never intended to convert the property to community property. *Id.* The trial court found based on the evidence that the wife did not intend to convert her separate property to community property. *Id.* at 347.

The Supreme Court held that although " 'a spouse may execute a quitclaim deed transferring the property to the community,' " the facts supported the trial court's finding that the

7

wife did not intend to convert her separate property to community property. *Id.* at 352 (quoting *Borghi*, 167 Wn.2d at 488-89).

    2.    Application of Legal Standard

Christopher argues that the trial court applied the wrong legal standard in determining the character of the house. We disagree.

As noted above, the legal standard is that a spouse's separate property remains separate unless the other spouse shows by clear and convincing evidence that the spouse intended to convert the separate property to community property. *Borghi*, 167 W.2d at 484-85 & n.4. Here, the trial court applied this standard. The court found by clear and convincing evidence that Christopher intended to convert his separate property to community property.

Christopher argues that the trial court failed to apply the presumption that separate property remains separate unless a contrary intent is shown. He notes that the trial court's ruling did not acknowledge the presumption.

However, in its oral ruling the court stated that "the house started as a separate asset of [Christopher]." Rep. of Proc. (RP) at 554. The court then stated that Christopher's "intent was to turn that separate property into community property." RP at 554. There is no indication in the record that the trial court failed to recognize the separate property presumption.

Christopher further argues that the trial court improperly relied on the quitclaim deed in determining his intent. He emphasizes that the Supreme Court has rejected the notion that including a spouse's name on a deed established an intent to convert separate property to community property.

However, nothing in *Borghi* or *Watanabe* suggests that quitclaim deed language cannot be considered at all in determining the grantor's intent. The court in *Borghi* stated that "a party

who intends to transmute her separate property into community property" can "execute a quitclaim deed transferring the property to the community." 167 Wn.2d at 488-89. The court in *Watanabe* stated that there must be "other evidence" besides the names on the title to determine the character of the property, "such as a quitclaim deed transferring the property to the community." 199 Wn.2d at 349.

We conclude that the trial court applied the proper legal standards in assessing the character of the house.

### 3. Challenged Findings of Fact

Christopher attempts to undermine the trial court's finding that he intended to convert the house from separate property to community property by challenging several of the trial court's findings of fact that support the court's intent finding. We conclude that substantial evidence supports these findings.

#### a. Findings of Fact 22(f) and (k)(2)

Christopher challenges the sentences in finding of fact 22(f) stating that "the parties' money and financial resources were intentionally comingled, with the exception of a few accounts," and finding of fact (k)(2) stating that "[t]he parties had comingled funds." CP at 202-03.

Of the Milles' six bank accounts, three were joint accounts. The Milles' also had a joint tenancy investment account. And Denise testified that during their marriage, she added Christopher to her rollover IRA account. She initially funded the account with money she earned before marrying Christopher, but after marriage, Christopher transferred money from their joint TwinStar account into the IRA account.

In addition, Christopher testified that he paid debts – including the mortgage on the house – using money from his paycheck, Denise's paycheck, and child support Denise received. And during cross-examination, Denise asked Christopher whether "from pretty early on [during their] marriage the two of [them] had decided to consolidate and comingle [their] financial accounts." RP at 78. Christopher responded, "Yes," because it was the best way to pay off their debts. RP at 78.

We conclude that this evidence is sufficient to support the trial court's findings of fact 22(f) and (k)(2).

b. Finding of Fact 22(g)

Christopher challenges the sentence in finding of fact 22(g) stating that he "primarily managed the family's financial affairs." CP at 202.

Although Christopher testified that Denise was included in everything and made debit/credit card transactions, he stated that he would actually write the checks and make the transfers in order to pay the bills. He primarily made the payments to the creditors and kept track of their debt and finances.

Denise testified that she gave Christopher access to all of her accounts and that he managed paying the bills. They would discuss what they were spending their money on, but because Christopher managed the finances, Denise never felt the need to look at their bank records or transaction history.

We conclude that this evidence is sufficient to support the trial court's finding of fact 22(g).

c.    Finding of Fact 22(k)(1)

Christopher challenges finding of fact 22(k)(1), which states that he and Denise "were married for quite some time when the Quit Claim Deed was signed." CP at 203.

Christopher and Denise were married for almost nine years when they both signed the quitclaim deed in 2020. A rational, fair-minded person would consider nine years as "quite some time." Therefore, we conclude that substantial evidence supports finding of fact 22(k)(1).

d.    Finding of Fact 22(k)(3)

Christopher challenges finding of fact 22(k)(3), which states that he had prior experience in his first marriage with converting separate interest to community interest by quitclaim deed and that "the Court finds [Christopher's] testimony not very credible that he did not understand what he was signing when he signed the Quit Claim Deed to the marital community with [Denise]." CP at 203.

Christopher testified that during his first marriage, he put Cara's name on the title of the house when they refinanced the house in order to take cash out. This was done by quitclaim deed. He testified that his intent was to create community property. This evidence is sufficient to support the trial court's finding that during his first marriage, Christopher had experience with converting separate interest to community interest by quitclaim deed.

As for whether Christopher understood what he was signing when he signed the quitclaim deed, the trial court found that Christopher's testimony that he did not understand the effect of the quitclaim deed was not credible. We "will not 'substitute [our] judgment for the trial court's, weigh the evidence, or adjudge witness credibility.' " *In re Marriage of Kaplan*, 4 Wn. App. 2d 466, 479, 421 P.3d 1046 (2018) (quoting *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007)).

11

Therefore, we conclude that substantial evidence supports finding of fact 22(k)(3).

e.    Finding of Fact 22(k)(4)

Christopher challenges finding of fact 22(k)(4), which states, Christopher's "prior actions, and his meticulous handling of financial affairs make it clear to the Court that he intended to create community property when he signed the 2020 Quit Claim Deed." CP at 203.

Christopher's prior actions consisted of refinancing the house twice before in 2005 and 2010. During his first marriage in 2005, he testified to intentionally converting the house to community property when he added his wife to the deed. This showed that he understood the process of refinancing and that a quitclaim deed could convert separate property to community property.

In addition, Denise testified that Christopher spent a lot of time on the couple's financial affairs.

Q. What is your opinion of his level of financial responsibility during the marriage?

A. Well, . . . [h]e spent a lot of time in our finances. He spent a lot of time at night going over things, researching. Every time I walked through the kitchen, he was on the computer looking at his TwinStar -- this or that, and very, very focused on the money.

RP at 243. Denise also stated that Christopher frequently questioned her about expenses that she had incurred.

We conclude that this evidence is sufficient to support the trial court's finding of fact 22(k)(4).

4.    Sufficiency of Evidence – Intent Finding

At its core, Christopher's argument is that clear and convincing evidence does not support the trial court's finding that he intended to convert the house from separate property to community property. He challenges finding of fact 22(j), which states,

> The home located [in] Tacoma, WA started as a separate asset of [Christopher], but the court assessed the credibility of the witnesses, and the court finds by clear, cogent and convincing evidence that [Christopher's] intent was to convert his separate property into community property when he signed the Quit Claim deed with the verbiage "intent to create community property".

CP at 203. We conclude that substantial evidence supports the trial court's finding of intent.

First, Christopher repeatedly argues that the trial court could not rely on the language in the quitclaim deed as evidence of intent. *Borghi* stated that "the name on a deed or title does not determine the separate or community character of the property, or even provide much evidence." 167 Wn.2d at 488. *Watanabe* repeated this language. 199 Wn.2d at 349.

But the trial court did not rely on the mere fact that Denise was added to the title in the quitclaim deed. The court also relied on the language of the quitclaim deed, which expressly stated that the purpose of the deed was to "establish community property." Ex. 105, at 1. *Borghi* and *Watanabe* did not hold that quitclaim deed language was irrelevant. The court in *Watanabe* noted that the name on the title does not determine the property's character, but then stated, "Rather, there must be other evidence, such as a quitclaim deed transferring property to the community." 199 Wn.2d at 349. The court in *Borghi* also stated that a spouse could convert separate property to community property by executing "a quitclaim deed transferring the property to the community." 167 Wn.2d at 488-89.

Second, Christopher argues that the language in the quitclaim deed is insufficient to prove by clear and convincing evidence that he intended to convert the house to community property. However, the trial court did not rule that inclusion of the phrase "to establish community property" in the quitclaim deed standing alone established Christopher's intent. Instead, the court recited four additional factors that it considered along with the quitclaim deed language in assessing Christopher's intent.

13

Third, Christopher argues that there was no "direct" evidence that he intended to convert the house to community property. He apparently relies on the statement in *Borghi*, derived from an earlier case, that separate property is presumed to remain separate "until some direct and positive evidence to the contrary is made to appear." 167 Wn.2d at 484. However, the court clarified in a footnote that "direct and positive evidence" should be understood as reflecting a clear and convincing evidence standard. *Id.* at 485 n.4.

In any event, the quitclaim deed does present direct evidence of intent. The deed that Christopher signed expressly stated that the purpose of the deed was to "establish community property." That is direct and positive evidence.

Fourth, Christopher argues that *Watanabe* shows that there was insufficient evidence here to establish his intent. In *Watanabe*, the wife executed a quitclaim deed for separate property to her and her husband "to establish community property." 199 Wn.2d at 346. The trial court found based on the testimony and exhibits at trial that the wife did not intend to convert the property from separate to community. *Id.* at 347. The Supreme Court affirmed. *Id.* at 355.

However, the court did not hold that the quitclaim deed was irrelevant. Instead, the court noted that "[i]n *Borghi,* the court explicitly stated 'a spouse may execute a quitclaim deed transferring the property to the community.' " *Id.* at 352 (quoting *Borghi*, 167 Wn.2d at 488-89). The court emphasized that the grantor's intent is the ultimate determining factor. *Watanabe*, 199 Wn.2d at 352. The court concluded that "[t]he facts presented support the trial court's finding" that the grantor did not intend to convert her separate property to community property. *Id.* Here, the trial court reached the opposite conclusion based on the specific facts and circumstances of this case.

Finally, Christopher argues that the additional evidence besides the quitclaim deed, on which the trial court relied, do not provide clear and convincing evidence of his intent. However, the fact that Christopher previously had executed a quitclaim deed with the intent to convert the house to community property was evidence that he had the same intent when executing a quitclaim deed to "establish community property." Ex. 105, at 1. In addition, the facts that the couple had commingled their funds and that Denise's financial resources contributed to paying the house's mortgage constituted evidence that the Milles' prior actions were consistent with Christopher converting the house to community property. And the fact that Christopher was meticulous in handling the couple's financial affairs was evidence that he would not have overlooked the language in the quitclaim deed.

Taken together, these factors – along with the language of the quitclaim deed – are sufficient for the trial court to find that it was highly probable that Christopher intended to convert the house to community property.

We conclude that substantial evidence supports the trial court's factual finding that Christopher intended to convert the house from separate property to community property. Therefore, we hold that the trial court did not err in characterizing the house as community property.[2]

C.    ATTORNEY FEES ON APPEAL

Christopher requests attorney fees pursuant to RCW 26.09.140. Denise also requests attorney fees under RAP 18.9. We deny fees on appeal.

RCW 26.09.140 provides,

---

[2] Christopher also challenges finding of fact 22(q), which states that Christopher owes Denise an equalization payment of $128,709. Because we hold that the trial court properly found that the house had been converted to community property, substantial evidence supports this finding.

15

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.

Christopher claims that he does not have the financial resources to pay for attorney fees, but Denise has the ability to pay. However, the trial court found that both parties have a need for attorney fees and so each would be responsible for their respective fees. Therefore, we deny Christopher's attorney fee request.

In the alternative, Christopher requests attorney fees on the basis of intransigence. "Determining intransigence is necessarily factual, but may involve foot-dragging, obstructing, filing unnecessary or frivolous motions, refusing to cooperate with the opposing party, noncompliance with discovery requests, and any other conduct that makes the proceeding unduly difficult or costly." *Wixom v. Wixom*, 190 Wn. App. 719, 725, 360 P.3d 960 (2015). There is no evidence here that Denise was intransigent.

Denise also requests fees on appeal, claiming that Christopher repeatedly failed to follow the Rules of Appellate Procedure. RAP 18.9(a) authorizes the appellate court to award compensatory damages if the failure harms a party. Although Christopher repeatedly failed to timely submit appellate court findings, the court clerk ordered its own sanctions for each untimely filing. Therefore, we deny Denise's attorney fee request.

## CONCLUSION

We affirm the trial court's characterization of the house as community property.

No. 57644-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

CRUSER, C.J.

, J.